717 S.E.2d 245

**STATE of West Virginia, Plaintiff Below, Respondent**

v.

**Jason Clay ANDERSON, Defendant Below, Petitioner.**

**No. 101367.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 2011.

Decided Sept. 29, 2011.

Harry P. Montoro, Esq., Law Office of Harry P. Montoro, PLLC, Morgantown, WV, for Petitioner.

Darrell V. McGraw, Attorney General, Laura Young, Esq., Assistant Attorney General, Charleston, WV, for Respondent.

PER CURIAM:

Jason Clay Anderson ("Defendant"), defendant below and appellant herein, appeals the April 21, 2010, order of the Circuit Court of Marion County finding the Defendant guilty of the offense of murder of a child by a parent, guardian or custodian and sentencing him to a term of life imprisonment without the possibility of parole.

For the reasons set forth in this Opinion, the circuit court's April 21, 2010, order is affirmed.

## I.

### Factual Background

On October 1, 2007, the Defendant was indicted by the Marion County Grand Jury for murdering his twelve-week old infant son

in violation of subsections (a) and/or (b), *W.Va.Code,* 61–8D–2 [1988]. Trial on the indictment began on April 7, 2010. A summary of the evidence introduced at trial is as follows.

The Defendant's infant son was a normal, healthy, baby at the time of his birth and discharge from the hospital. The baby's mother was the Defendant's live-in girlfriend, Jennifer Meacham.[1] Following discharge from the hospital, the Defendant and Ms. Meacham resided in the home of the Defendant's elderly, disabled, grandfather.

On June 23, 2007, EMTs Bernetta Bebee and Earl Haught of the Marion County Rescue Squad ("Rescue Squad") were dispatched by 911 to the Defendant's residence for a medical crisis involving an infant. Ms. Bebee, a five-year veteran of the Rescue Squad, testified that when she first saw the baby she was shocked—that she "just wasn't prepared for what [she] saw." Ms. Bebee testified that the baby's left pinkie finger was black, that the baby's diaper was drenched in urine, and blood had already pooled and that it was obvious that the baby had died. When asked about how the parents were reacting to their baby's medical crisis, Ms. Bebee testified that when she "walked into [the Defendant's] house ... the calm was just eerie. It just wasn't normal[.]" When asked to explain, Ms. Bebee said that neither the Defendant nor Ms. Meacham exhibited any urgency, but instead were very casual, so much so that at one point the Defendant even "kind of laughed" when he informed Ms. Bebee that he had given her cell phone—that she had accidently dropped when rushing to tend to the baby—to her partner. After loading the baby into the ambulance, neither the Defendant nor Ms. Meacham asked to ride with their baby to the hospital.

Earl Haught, who had worked with the Rescue Squad for twenty-two years, also testified. Mr. Haught related that he too was struck by the Defendant's lack of emotion because typically, when there is this type of an event, people are hysterical. Instead of being hysterical, Mr. Haught observed that

---

1. Ms. Meacham was also indicted with the Defendant, but reached a plea agreement with the State prior to trial. As part of that agreement,

Ms. Meacham testified on behalf of the State at the Defendant's trial.

the Defendant and Ms. Meacham just stood at the door and that it did not appear to him that they cared what was happening. After putting the baby into the ambulance, Mr. Haught testified that "neither the mother nor the father either one came outside [and that] the mother actually told [him] to have somebody call her from the hospital to let her know what was going on. Nobody rode to the hospital with us, nothing."

Deputy Matthew Love and Deputy Christopher Gearde also responded to the 911 call and arrived at the Defendant's house minutes following the Rescue Squad's departure to the hospital. Deputy Love testified that upon arrival, he and Deputy Gearde did a cursory look around the house and told the Defendant and Ms. Meacham that they would need to give a statement. Deputy Love also testified that the baby's crib "smelled badly of urine. A strong odor." On further examination, Deputies Love and Gearde observed a foam mattress inside the crib. Deputy Love testified that when Deputy Gearde lifted the foam mattress from the crib and held it up, that "urine actually ran out of the mattress. It wasn't squeezed and it came out. It ran out."

When asked to describe the Defendant's and Ms. Meacham's demeanor, Deputy Love testified that both were "[j]ust matter of fact. No real show of emotion. They didn't seem to be upset or angry or—no one was crying. No one at the house was crying but the deputies." After the Defendant was taken to the hospital, Deputy Love continued to observe the Defendant and noted that he still did not appear to be upset when talking to the county coroner. When the coroner asked whether the Defendant had any questions, the Defendant turned and looked at Deputy Love and said "You know, I want to know what the four-wheeler laws are. I like to ride four-wheelers. Can you tell me what the four-wheeler laws are right now? I know they changed." Deputy Love testified that in response he just looked at the Defendant and said "Are you kidding me? ... I don't know what the four-wheeler laws are right now. Your child just died. Do you have any questions about that?" The Defendant did not have any questions about his baby's

death. Deputy Gearde later testified to many of the same facts as Deputy Love.

Amanda Oliverio, a neighbor of the Defendant's, testified that she knew that the baby was not receiving proper nourishment because he was losing weight. When asked to describe the baby's room, Ms. Oliverio testified that:

> ... the [baby's] bed was always wet. There were dirty diapers. [That on] the railing of the bed, there was always diapers lined up, dirty ones, full of poop, because they were brown. And the smell was awful. Which the house smelled anyhow. But it was horrible from there. Dirty clothes that were covered in pee and poop. Dirty blankets on the floor. Dirty clothes all over the floor. The baby would be just laying in it.

Ms. Oliverio described the Defendant as being the dominant partner in his relationship with Ms. Meacham and that she would follow the Defendant "like a lost puppy dog" and whenever Ms. Oliverio wanted to see the baby, Ms. Meacham would say that she had to ask the Defendant if it was okay to go get the baby. Ms. Oliverio also testified that she became so concerned with the baby's welfare that she called Child Protective Services ("CPS") on "multiple occasions" and told CPS that "the child was being left alone" and "not being fed properly." When asked what happened after she called CPS, Ms. Oliverio related that on one occasion CPS showed up at the Defendant's house and that she (Ms. Oliverio) walked up the hill to watch, but that CPS stayed on the front porch and did not enter the Defendant's residence and did not examine the baby's physical condition. Ms. Oliverio related that following this CPS visit, she went to the Defendant's house and asked the Defendant and Ms. Meacham "what was that all about." In response, both the Defendant and Ms. Meacham replied that "Oh, CPS keeps coming up here" and that they were "getting sick of them, ... they are so dumb they don't even come in the house and check it out." Ms. Oliverio related that both the Defendant and Ms. Meacham laughed when describing the CPS visits.

The baby's mother also testified. Ms. Meacham related that the Defendant was

extremely controlling of her, that he had been abusive towards her, that he would not let her go anywhere unless he accompanied her, and that he became upset when he learned that she was pregnant and accused her of cheating on him. After their baby was born, the Defendant disavowed being the baby's biological father and told her that the baby was not his responsibility. The Defendant also ordered his grandfather, Denzil Anderson, to take care of the baby notwithstanding that Mr. Anderson was elderly, legally blind and in poor health. Afterwards, the Defendant placed the baby's crib in Mr. Anderson's bedroom.

Ms. Meacham admitted that the baby's hygiene was not properly maintained, and that the baby would sometimes be left in the same diaper for days at a time. She related that the Defendant would not permit her to change the baby's diaper, and when she did try to care for the baby, the Defendant would "grab [her] by [her] arm and throw [her] back on the bed and tell [her], no, you're not going." Ms. Meacham admitted that both she and the Defendant knew that the baby was covered with urine and feces, and that the foam pad in his crib was soaked with urine.

Ms. Meacham also admitted that she and the Defendant did not properly feed the baby and that there were occasions when they did not feed him for two or three days at a time. Ms. Meacham did offer, however, that occasionally the Defendant would prop a bottle on a blanket so the baby could feed himself.

Ms. Meacham testified that she wanted to take the baby to a doctor, but that the Defendant refused and that she was afraid to disobey him because of his abusive behavior. One example of the Defendant's abusive behavior was that when the baby would cry, the Defendant would become angry, that "[h]e would shake the crib so hard that it would scare [the baby] and make him scream louder. Or he would hit him." When asked to describe how he hit the baby, Ms. Meacham stated "[s]ometimes fist, sometimes open hand."

When asked about the CPS's visits, Ms. Meacham testified that both she and the Defendant tried to either avoid the CPS workers or would wrap the baby in a blanket to prevent the CPS workers from seeing the condition of his skin. None of the CPS investigators who saw the baby ever requested that the blanket be removed so they could examine him.

On the date of the baby's death, Ms. Meacham testified that the Defendant's adoptive father woke her and told her that the baby felt cold to the touch. When she checked the baby, Ms. Meacham believed that the baby was dead. When she told the Defendant and said they should call 911, the Defendant refused, saying that instead they first needed to clean the house. As part of this house cleaning, Ms. Meacham and the Defendant put toys around the baby's crib and, after cleaning the house for three or four hours, called 911. While waiting for emergency responders, the Defendant instructed Ms. Meacham to tell the authorities that they had fed the baby around 2:30 a.m. that morning, changed his diaper, and that the baby was fine at that time.

Dr. Charles Mihelic, the Emergency Room ("ER") physician who attended to the baby when he was brought in to the ER by the Rescue Squad, testified that the baby had no cardiac activity upon arrival in the ER and that rigor mortis had already begun to set in. Describing the baby's physical condition, Dr. Mihelic related that he observed lesions on the baby's body, a "big band of raw skin across the child's abdomen," that the "tip of [the baby's] left fifth finger appeared to be necrotic" and had begun to rot off, that the tip of the baby's "penis was ulcerated" which was "something that didn't just happen in a few hours," and that a rash covered most of the baby's body. Dr. Mihelic opined that the injuries he observed on the baby's body pre-existed his death by days to weeks.[2]

Dr. Zia Sabet, Deputy Chief Medical Examiner for the State of West Virginia, testified as an expert witness. Dr. Sabet testified

---

2. Dr. Mihelic was admitted, without objection, as an expert in the area of emergency trauma medi-cine.

that his office was notified because the baby's physical condition, including the lesions on his abdomen, head and extremities, made his death suspicious.

Dr. Sabet testified that he observed that the baby had on a disposable diaper that smelled, was full of fecal material and urine, and that the diaper had flies and "other animals" generally not seen post-mortem. Further, the baby had numerous lesions on his head, buttocks, sacral region, abdomen, scrotum, penis, anus, the inner aspects of both thighs, and the back of both hands. Dr. Sabet explained that the lesions, which were discolored and obvious to anyone who would have looked at the child, were likely caused by constant contact with urine over a ten day to two week period. As a consequence of the lesions, and the associated thickening of the skin with some skin actually falling off, the baby would have been unable to move his hands and would have been in pain.

In addition to the lesions on the baby's body, Dr. Sabet also testified that his examination of the baby revealed physical injuries to the baby's left buttock, right temple, head, back and abdomen. As to the cause of those physical injuries, Dr. Sabet opined that the baby had been struck with a heavy object one or two days before his death.

Dr. Sabet also testified that the baby was severely malnourished. In explaining this finding, Dr. Sabet told the jury that the baby, who had been born healthy, was at the time of his death in the lowest possible percentage for weight, had only one-half of the subcutaneous fat that he should have had, and that there was less than normal vitreous fluid in the baby's eyes, all of which further supported a finding of malnutrition and lack of hydration.

As to a cause of death, Dr. Sabet's conclusions were that the baby:

> ... a two- and a-half-month old, relatively small for age, who died suddenly and unexpectedly in the setting of severe care-taker maltreatment, including evidence of nonaccidental soft tissue injuries, poor hygiene with severe diaper rash, and investigative findings indicative of severe caretaker neglect. While a specific underlying mechanism of death has not been identified, the post-mortem and investigative findings point to severe caretaker maltreatment as the underlying cause of death. Infant's demise, death. *So manner of death in this case is classified as homicide.* (Emphasis added.).

Following conclusion of testimony, arguments of the parties and the trial court's charge, the jury found the Defendant guilty of murdering his infant son. In the penalty phase, the same jury did not make a recommendation of mercy and the Defendant was thereafter sentenced to life imprisonment without the possibility of parole. It is from this conviction and sentence that the Defendant now appeals.

## II.

### Standard of Review

In Syllabus Point 4 of *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996), we explained that "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" With regard to the evidentiary rulings of a circuit court, we held in Syllabus Point 1 of *State v. Calloway,* 207 W.Va. 43, 528 S.E.2d 490 (1999), that " '[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syllabus point 10, *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds, State ex rel. R.L. v. Bedell,* 192 W.Va. 435, 452 S.E.2d 893 (1994)."

## III.

### Discussion

The Defendant argues four assignments of error in this appeal. These assignments are: (1) insufficiency of the evidence; (2) that the circuit court erred in denying a pre-trial defense motion to disqualify both the prosecuting attorney and the prosecutor's office; (3) that "gruesome" photographs were improperly admitted into evidence and enlarge-

ments of those photographs subsequently displayed to the jury; and, (4) plain error with regard to the Defendant's allegation that he was made to appear in court in handcuffs and/or shackles during the penalty phase of his trial.

### Insufficiency of the Evidence

In this assignment of error the Defendant argues that the prosecution's evidence was insufficient to prove his guilt beyond a reasonable doubt. The Defendant's arguments are without merit.

██ In Syllabus Point 1 of our decision in *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), we held that:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

We have further held that "[a] reviewing court should not reverse a criminal case on the facts which have been passed upon by the jury, unless the court can say that there is reasonable doubt of guilt and that the verdict must have been the result of misapprehension, or passion and prejudice." Syllabus Point 3, *State v. Sprigg*, 103 W.Va. 404, 137 S.E. 746 (1927).

The Defendant was charged with murder of a child by a parent, guardian or custodian in violation of subsections (a) and/or (b) of *W.Va.Code*, 61–8D–2 [1988]. *W.Va.Code*, 61–8D–2 [1988], subsection (a), provides that:

> If any parent, guardian or custodian shall maliciously and intentionally cause the death of a child under his or her care, custody or control by his or her failure or refusal to supply such child with necessary food, clothing, shelter or medical care, then such parent, guardian or custodian shall be guilty of murder in the first degree.

*W.Va.Code*, 61–8D–2 [1988], subsection (b), provides that:

> If any parent, guardian or custodian shall cause the death of a child under his or her care, custody or control by knowingly allowing any other person to maliciously and intentionally fail or refuse to supply such child with necessary food, clothing, shelter or medical care, then such other person and such parent, guardian or custodian shall each be guilty of murder in the first degree.

The Defendant had a jury trial, his jury found him guilty and, in a bifurcated penalty phase, that same jury did not make a recommendation of mercy, *i.e.*, the jury did not recommend that the Defendant ever be eligible for parole.

██ Our review of the evidence introduced at the Defendant's trial, a summary of which we have set forth in Section I, *supra*, clearly demonstrates that sufficient evidence existed upon which a "rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, in part, *State v. Guthrie*, *supra*. This is particularly the result when the evidence is "viewed in the light most favorable to the prosecution," *Id.*

### Motion to Disqualify

██ The Defendant argues that the trial court erred in denying his motion seeking to disqualify the Marion County Prosecuting Attorney ("Prosecuting Attorney"), and all the lawyers in the Prosecuting Attorney's office (collectively referred to herein as "Prosecutor's Office").

The record shows that in September 2009, one of the two attorneys appointed to represent the Defendant accepted an offer of employment with the Prosecutor's Office and, upon that acceptance, withdrew from the Defendant's case. For purposes of clarity, we refer to the withdrawing attorney as "former counsel." Shortly after the former counsel withdrew from the Defendant's case, the Defendant's remaining lawyer filed a motion to disqualify the Prosecutor's Office.

The grounds set forth in the motion alleged that in June or July 2009, the Prose-

cuting Attorney approached the Defendant's former counsel about a possible employment opportunity with the Prosecutor's Office. Notwithstanding that discussion, the former counsel did not inform the Defendant or his other attorney that there was a possibility that he might accept a position with the Prosecutor's Office. This failure, the Defendant contended, constituted a violation of the former counsel's duty to the Defendant. In the attempt to demonstrate prejudice, the Defendant argued that the former counsel had been in plea negotiations with the Prosecuting Attorney at the time of the employment discussion and that his former counsel would have been subconsciously disinclined to aggressively represent the Defendant's interest in fear of aggravating his possible future employer.

■ In Syllabus Point 2 of *State ex rel. Tyler v. MacQueen*, 191 W.Va. 597, 447 S.E.2d 289 (1994), we addressed a similar situation, holding that:

> Pursuant to *Rule 1.11* of the *West Virginia Rules of Professional Conduct*, the fact that an assistant prosecuting attorney previously represented a criminal defendant while in private practice does not preclude the prosecutor's office as a whole from participation in further prosecution of criminal charges against the defendant, provided that the circuit court has held a hearing on any motion to disqualify filed on this basis and determined that the assistant prosecutor has effectively and completely been screened from involvement, active or indirect, in the case.

The record before us shows that on December 1, 2009—nearly five months prior to commencement of the Defendant's jury trial—the trial court held a hearing on the Defendant's motion to disqualify as required by our decision in *State ex rel. Tyler v. MacQueen*. Reviewing the transcript of that hearing, as well as the Defendant's motion to disqualify, we see no evidence that the Defendant's former counsel was not "effectively and completely ... screened from involvement, active or indirect, in the case" after

former counsel started working for the Prosecutor's Office. Syllabus Point 2, *State ex rel. Tyler v. MacQueen, Id.* Accordingly, the trial court did not err in denying the Defendant's motion to disqualify.

## Gruesome Photographs

■ The Defendant argues that the trial court erred in admitting five photographs into evidence because they were so "gruesome" that the probative value of the photographs was clearly outweighed by their prejudicial impact. In Syllabus Point 8 of our decision in *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994), we held that "[t]he admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the *West Virginia Rules of Evidence*."

The record shows that the trial court held a pre-trial hearing to review numerous photographs marked by the prosecution as possible exhibits for trial. These photographs showed the Defendant's baby both during his life and after his death. After reviewing the photographs, the trial court limited the prosecution to using only five photographs that showed the baby.[3] Of these five photographs, one showed the baby shortly after his birth and the remaining four were of the baby after his death. While the photographs taken after the baby's death are disturbing, the probative value clearly outweighed any prejudicial impact.

■ The photograph depicting the baby near the time of his birth was relevant to the prosecution's evidence that the baby had been born healthy—the jury was entitled to not only hear testimony that he was both healthy, but to see that in a photograph. Regarding the remaining four photographs, one was taken at the ER to preserve evidence of the baby's condition when he arrived in the ER, and the remaining three were taken by the Medical Examiner at autopsy. These four photographs show the baby's physical condition, including the ulcerated lesions on his stomach, thighs, penis, scrotum, anus, and other body parts. The

---

**3.** The prosecution had other photographs that the trial court permitted to be introduced; however, those photographs did not show the baby and are not relevant to the discussion in this Opinion.

prosecution was entitled to show these photographs to the jury as evidence relevant to the material elements that the prosecution needed to prove.

The Defendant also argues that the trial court erred by permitting the prosecution to use poster sized blow-ups of one or more of the admitted photographs as demonstrative aids. The trial court detailed its reasoning for allowing the use of the enlarged photographs as demonstrative aids (as well as its reasoning for restricting that use) when it held:

> My ruling will be that the photographs—the blow-ups may be used on the easel, as you would use the video-imaging technology, to assist a witness in their testimony. Because I think otherwise we've got three-by-five photographs and it would be virtually impossible for a witness to point out on those small photographs the things that they want the jury to be able to see. So that's okay.
>
> Now, the other question is, I think when the jury goes to its jury room, we're going to only give them the small photographs. We won't give them the blow-ups when they go to the jury room.

In addition to prohibiting the enlarged photographs from going to the jury room, the trial court also barred the prosecution from displaying, during opening statements, any enlarged photograph that depicted the baby after its death. The trial court explained this restriction:

> ... Let's not show the blow-up during opening. I'll restrict you to using the small photograph for opening. You can use the blow-up of the child, the live photograph taken at birth.... I just think the first time they see these photographs, I think it would be ... less prejudicial to the defendant if we use the small photograph.
>
> The Court's balanced the prejudicial effect and the probative value, and it seems to me that at some point the larger the photograph, the larger the depiction, the more prejudicial effect it has. I think I've attempted to strike a balance. And I think the balance that I've achieved is appropriate.

While the four photographs depicting the baby following his death are disturbing, they were admissible as evidence relevant to material elements of the prosecution's burden of proof and the probative value clearly outweighed any prejudicial impact. The photographs evidence the conduct of the Defendant surrounding the baby's death and the deterioration of the baby's condition during the twelve weeks that the baby lived with the Defendant. Accordingly, we find no error in the trial court's admission of the photographs in issue.

**Plain Error**

The Defendant's final argument is that we should recognize as plain error his allegation that he was forced to wear handcuffs and/or shackles in the presence of the jury during the penalty phase of his trial. In Syllabus Point 3 of *State v. Finley*, 219 W.Va. 747, 639 S.E.2d 839 (2006), *cert. denied*, 549 U.S. 1298, 127 S.Ct. 1860, 167 L.Ed.2d 351 (2007)(emphasis added), we held that "[d]ue process afforded by the West Virginia and United States Constitutions demands that a criminal defendant *may not routinely be compelled* to appear in jail or prison clothing at the penalty phase of a bifurcated murder trial." We also opined in *Finley*, 219 W.Va. at 752, 639 S.E.2d at 844, that:

> we find no discernable difference in the prejudicial effect upon a jury of seeing a person in prison garb versus seeing that person in shackles in light of the decision the jury is obliged to make at this portion of the trial. At the penalty phase, the jury is no longer looking narrowly at the circumstances surrounding the charged offense. In order to make a recommendation regarding mercy, the jury is bound to look at the broader picture of the defendant's character—examining the defendant's past, present and future according to the evidence before it—in order to reach its decision regarding whether the defendant is a person who is worthy of the chance to regain freedom.

While our precedent makes clear that having a defendant wear prison garb or physical restraints in the presence of a jury has due process implications, Syllabus Point 4 of our decision in *Finley, Id.*, also makes clear that:

[t]he decision regarding whether a criminal defendant be required to wear identifiable prison or jail clothing at the penalty phase of a bifurcated murder trial is within the sound discretion of the trial court, subject to an evidentiary hearing that establishes an essential state interest which justifies imposing the requirement.

In the present appeal, Defendant's counsel candidly acknowledges that he failed to make an objection when the Defendant was brought into court in shackles and/or handcuffs. Counsel nonetheless argues that this Court can, and should, address it as plain error. We disagree.

In Syllabus Point 7 of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), we held that "[t]o trigger application of the 'plain error' doctrine there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." In the present appeal, there is *no record* that even suggests that the Defendant was made to wear handcuffs and/or shackles during the penalty phase of his trial.[4] Because there is no record on this assignment of error, we find that any error that may have occurred is not plain and, accordingly, that the assigned error is not one capable of review under the plain error doctrine.

## IV.

### Conclusion

For the reasons set forth herein, the Defendant's conviction and sentence is affirmed.

Affirmed.

---

4. However, there is evidence in the record that the Defendant's conduct during his pretrial incarceration raised legitimate security issues that likely would have warranted greater security measures for this particular Defendant. This evidence includes the fact that shortly prior to the Defendant's trial he was arrested for threatening to commit a terrorist act. The basis of the charge was that the Defendant had written to the Governor of the State of West Virginia requesting a pardon and, if the Governor refused, that the

Defendant would have someone shoot the Governor in the head; that the Defendant would blow up the State Capitol with all the employees inside it; and, that the Defendant would rape the Governor's wife, daughter and family dog. The Defendant also threatened to "have a hit on President Obama." In addition, the Defendant was in disciplinary segregation at the regional jail where he was incarcerated for fighting with another inmate and for attacking correctional officers.