# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

vs) **No. 12-0120** (Wood County 08-F-24)

**William R. Johnson,**
**Defendant Below, Petitioner**

**FILED**

**October 25, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The Petitioner, William R. Johnson, by counsel Michele Rusen, appeals the October 19, 2011, Amended Order re-sentencing the Petitioner following his jury conviction of second degree murder under West Virginia Code § 61-2-1 (2010); murder of a child by a guardian by failing to supply necessary medical care under West Virginia Code § 61-8D-2 (2010); and death of a child by a guardian under West Virginia Code § 61-8D-2a (2010). The Petitioner was sentenced to forty years in prison for the second degree murder conviction, life without the possibility of parole for the murder of a child by failing to supply necessary medical care conviction and forty years in prison for the death of child by a guardian conviction. The State of West Virginia, by counsel Thomas W. Rodd and Scott Johnson, filed a Response Brief. The Petitioner filed a reply.

On appeal, the Petitioner alleges that the circuit court erred: 1) by failing to direct a verdict of not guilty on the charge of murder of a child by a guardian by failing to supply necessary medical care due to insufficient evidence; 2) by permitting the jury to find the Petitioner guilty of both second degree murder and murder of a child by failing to provide medical care as the verdicts are factually inconsistent; 3) in refusing to order a new trial on the ground that a witness, Thomas Jackson, received favorable treatment from the prosecution for his testimony; and 4) by denying the Petitioner's motion for a mistrial following a spectator's outburst that the Petitioner was a "liar" while the Petitioner was testifying before the jury. The Petitioner also argues that his trial counsel failed to address the issue of mercy in any meaningful fashion during his closing argument and that cumulative errors, including several evidentiary rulings made by the trial court, warrant reversal.

After carefully reviewing the record provided, the briefs and oral arguments of the parties, and taking into consideration the relevant standards of review, the Court determines that the circuit court committed no error. Based on our decision that this case does not present a new question of law, a memorandum decision is appropriate under Rule

1

21 of the West Virginia Rules of Appellate Procedure.

## I. Facts

According to the evidence offered at trial, in January of 2007, the victim, Jada W.,[1] then fifteen-months-old, was living in Parkersburg, West Virginia, with her mother, Stephanie W., the Petitioner William R. Johnson, Stephanie's boyfriend, and S. J., Stephanie's then two-month-old child with the Petitioner.

On the evening of January 12, 2007, Jada and S.J. were in the Petitioner's care while Stephanie was working at a bar. Stephanie testified she purchased a twelve-pack of beer for the Petitioner before she went to work. She stated that she called the Petitioner from work at around 10:30 p.m., to check on the children. The Petitioner said that both girls were fine, and that S.J. was asleep and Jada was bathing. Stephanie did not call to check on the girls again; she finished her shift and returned home between 3:35 and 3:45 a.m.

Thomas Jackson also testified at trial. He and the Petitioner had been housed in the same cell at the North Central Regional Jail, while the Petitioner was awaiting trial on the charges in the instant case.[2] According to Mr. Jackson, on April 7, 2008, the Petitioner told him that he believed that Stephanie was cheating on him with Jada's father, Justin W. The Petitioner said that when Stephanie left him home alone, and he had trouble contacting her, he imagined that she was cheating on him. The Petitioner said that Justin W. and Stephanie were trying to make a fool out of him.[3]

---

[1]Consistent with our practice, we identify the juveniles involved in this case by initials only. *See Matter of Jonathan P.*, 182 W. Va. 302, 303, n.1, 387 S.E.2d 537, 538, n.1 (1989); *see also* W. Va. R.A.P. 40(e).

[2]Before April of 2008, and before any involvement in the instant case, Mr. Jackson's lawyer had negotiated a plea agreement with the prosecution regarding several fraudulent schemes charges, mostly involving credit cards. The agreement was for Mr. Jackson to plead guilty to a felony and to receive a sentence of seven years. In return, other Wood County charges would be dismissed. The final plea agreement was not committed to writing prior to Mr. Jackson testifying in the instant case. At the time Mr. Jackson testified against the Petitioner, he had received no promise of a better plea deal from the Wood County Prosecutor's office. Mr. Jackson was aware, however, and he so told the jury, that his plea deal could change for the better as a result of his testifying.

[3]According to Stephanie, Jada's father had begun to come to her home and workplace to see Jada and to attempt to reconcile with Stephanie. When Stephanie told the Petitioner

(continued...)

The Petitioner proceeded to tell Mr. Jackson about the details of Jada's death. Mr. Jackson testified that the Petitioner told him that Jada was crying and he went to her room and told her to "shut up." The Petitioner left the room. Jada's crying escalated and he went back up to the child's room and "when he picked her up, he said that this was the first time that he could clearly see . . . the combination of . . . [her father] and . . . [Stephanie] . . . and how that upset him. And that was when he lost control, he said." The Petitioner told Mr. Jackson how he swung the child's body against a metal bed rail. The Petitioner heard the child's skull crunch and "some sort of brown, something maybe like vomit or something . . ." came out of the child.

Mr. Jackson continued to explain how the Petitioner told him that he took Jada to the sink in the kitchen to clean her up. The Petitioner told Mr. Jackson that is when he noticed that the child was still breathing: "I could see she was breathing and I wondered if I could save her or not or if I should try to, but then I saw the indentation on the back of her head and I knew she was ruined." He then took the child back up to her room and laid her down in front of her bed, presumably to make it look as if the child had fallen out of bed. The Petitioner returned to bed with S.J. and fell right asleep, because he was "so f-----ng drunk."[4] The Petitioner told Mr. Jackson that he woke for a moment when Stephanie came home,[5] and worried that she might check on Jada, but he fell back asleep after Stephanie got into bed for the night without checking on Jada. The Petitioner also told Mr. Jackson that he felt lucky because that night was the first night that Jada had not slept in her playpen, so the Petitioner felt that he could better explain the injuries.

---

[3](...continued) about her interactions with Justin W, the Petitioner was unhappy. Stephanie made arrangements for Justin W. to visit their daughter at her home. The Petitioner insisted that he must be present in order for the visit to occur. Stephanie testified that the Petitioner thought she wanted to be with Justin and not him.

[4]The Petitioner testified that even though he drank five or six beers the night of Jada's death, he was not drunk. Further, despite testimony that he told a friend on the phone that he was also drinking vodka, the Petitioner testified that he was joking when he made that comment to his friend.

[5]When Stephanie returned home from work at around 3:45 a.m., there was no sound from anyone in the house. Because she heard no sound from Jada's room, she did not go into the child's bedroom. Stephanie joined the Petitioner and S.J. in bed and slept until 10:30 a.m.

The next morning, January 13, 2007, Stephanie went to Jada's bedroom and found the child lying on her bedroom floor, unresponsive. Jada was "cold to the touch[,]" and showed no sign of breathing. Stephanie noticed a large bruise on top of the child's head, abrasions on the side of her head, on her forehead and on her mouth. Stephanie also noticed "brown stuff" on Jada's nose and lip. Stephanie called 911.

Jada was taken to Camden-Clark Memorial Hospital where she was pronounced dead. Dr. Anthony Wayne Kitchen, an emergency medicine physician who treated Jada, testified that based on the child's body temperature she had been deceased for a while. He testified that he diagnosed head trauma due to his physical findings, but he did not make any definite decision as to what caused the child's death.

Dr. Iouri Boiko, the deputy chief medical examiner for the State of West Virginia at the time of the child's death, testified that the most serious injury inflicted on Jada was a compound skull fracture. Dr. Boiko testified that an infant's skull, at Jada's age, is more difficult to fracture. He testified that a fall could not have caused the damage found on Jada's skull. This type of damage required a "very powerful blow to the bone." Jada's injuries also included multiple skull contusions and abrasions consistent with multiple powerful impacts, epidural and subdural hemorrhaging, and multiple blunt force injuries to the trunk and extremities. The medical examiner testified that Jada died sometime between 11:00 p.m. on January 12 and 4:00 a.m. on January 13. The medical examiner testified that he could not "say for sure how long . . . it was she was alive after [the] injury."

Stephanie testified that she initially told the police that she was at home on the night that Jada was killed to "protect" the Petitioner.[6] She explained that she was frightened and felt her family was "falling apart." Stephanie testified that she and the Petitioner discussed the details of her story so the Petitioner would "know what to say." Later, Stephanie admitted to authorities that she had been at work that night until about 3:00 a.m. Prior to the Petitioner's trial, Stephanie pled guilty to a charge of child neglect causing death for leaving Jada with an unfit caretaker, and received a three-to-fifteen-year sentence. She disclosed her plea and her sentence to the jury at the Petitioner's trial.

The State also offered evidence of other occasions when the Petitioner had treated Jada harshly or had caused injury to her. The trial court found this evidence admissible under West Virginia Rule of Evidence 404(b) for the purpose of showing malice

---

[6]Interestingly, Mr. Jackson testified that the Petitioner was pleased that Stephanie had told the police that she was not at work when Jada was killed. The Petitioner told Mr. Jackson that, "Now she'll look like a liar."

by the Petitioner towards the child.[7]  First, Timothy Caplinger, who was a neighbor of the Petitioner and Stephanie, testified that on several occasions he had observed the Petitioner handling Jada roughly when placing her into the car.  Stephanie and Mr. Jackson also testified about prior incidents where Jada received injuries that were inflicted by the Petitioner,  including a fractured leg that went untreated for a week.

The Petitioner testified at trial that he put Jada to bed early in the morning of January 13, sometime between midnight and 12:30 a.m. and he then went to sleep.  When he woke up the next morning, Jada was dead. The Petitioner testified that he had no idea how Jada was injured.

## II.  Discussion of Law

A.    Sufficiency of the Evidence

The Petitioner argues that there was insufficient evidence offered by the State to support the jury's guilty verdict based upon West Virginia Code § 61-8D-2 (murder of a child by a guardian by failing to supply necessary medical care).[8]  He asserts that the State was required to prove that he, while a custodian of Jada, maliciously and intentionally caused her death by his failure or refusal to supply Jada with necessary medical care.  The Petitioner focuses upon his contention that there was insufficient "medical evidence concerning the effect of or need for medical treatment in terms of preventing or causing. . . [Jada's] death . . . ."

The standard of review for sufficiency of the evidence claims is set forth in syllabus point one of *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995):

---

[7]The Petitioner asserts the trial court erred in allowing this evidence under West Virginia Rule of Evidence 404(b).  We disagree and find that the trial court did not abuse its discretion in deciding to admit the evidence.  *See State v. McGinnis*, 193 W. Va.147, 159, 455 S.E.2d 516, 528 (1994) ("[W]e review the trial court's decision to admit evidence pursuant to Rule 404(b) under an abuse of discretion standard.").

[8]According to the Petitioner "[c]losely related to" this argument is his second assignment of error that the trial court erred, as a matter of law, by permitting the jury to find him guilty of both second degree murder and murder of a child by failing to provide medical care because the verdicts are factually inconsistent.  We readily dispense with this assignment of error.  As we recognized in *State v. Hall*, 174 W. Va. 599, 328 S.E.2d 206 (1985), "appellate review of a claim of inconsistent verdicts is not generally available." *Id*. at 603, 328 S.E.2d at 210 (citing *United States v. Powell,* 469 U.S. 57 (1984) and *Dunn v. United States*, 285 U.S. 390, 393 (1932)).

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Further, in syllabus point three of *Guthrie*, we held:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt . . . .

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part.

The elements necessary to establish a conviction for murder pursuant to West Virginia Code § 61-8D-2 are set forth in the statute as follows:

(a) If any parent, guardian or custodian shall maliciously and intentionally cause the death of a child under his or her care, custody or control by his or her failure or refusal to supply such child with necessary food, clothing, shelter or medical care, then such parent, guardian or custodian shall be guilty of murder in the first degree.

*Id.*

In the present case, the State presented evidence that the Petitioner slammed

6

Jada's head against a metal bed frame, resulting in a compound fracture to the child's skull, among other injuries. The medical examiner testified that the child survived the injuries inflicted by the Petitioner as he testified that he could not "say for sure how long [of a] time it was she was alive after [the] injury." Further, there was evidence that the Petitioner knew that Jada was alive after he inflicted the injury as he told Mr. Jackson: "'I could see she was breathing and I wondered if I could save her or not or if I should try to, but then I saw the indentation on the back of her head and I knew she was ruined.'" Yet, the Petitioner failed to supply medical care to the child; rather, he simply took the child back up to her room and laid her down in front of her bed to die. Then, the Petitioner went to bed. Additionally, the State introduced in evidence other instances in which the Petitioner treated Jada roughly, including fracturing a leg, for the purpose of showing malice by the Petitioner towards the child. When the Petitioner fractured Jada's leg, he did not tell Stephanie about the fracture. When Stephanie noticed swelling in the leg, she took the child to the hospital, where x-rays revealed a spiral tibia fracture that was about a week old.

This Court finds that based upon the evidence in this case, the Petitioner failed to meet his heavy burden in proving that the evidence was insufficient to sustain his conviction.[9] Instead, we find that when the evidence is viewed in the light most favorable to the prosecution it was sufficient to support the Petitioner's conviction of first degree murder for maliciously and intentionally causing Jada's death while under his care, custody and control by refusing to supply the child with necessary medical care. *See* W. Va. Code § 61-8D-2; *see also State v. Thornton*, 228 W. Va. 449, 720 S.E.2d 572 (2011) (affirming mother's conviction for neglect resulting in the death of child after finding sufficient evidence to support conviction); *State v. Anderson*, 228 W. Va. 58, 717 S.E.2d 245 (2011) (affirming father's conviction for first degree murder without mercy under same statute after determining that sufficient evidence supported conviction).

B.      Denial of Post-Trial Renewed Motion for New Trial

The Petitioner argues that the circuit court erred in refusing to order a new trial on the ground that Thomas Jackson, the Petitioner's cell-mate, received a very favorable plea agreement from the prosecution for his testimony at trial. Prior to Mr. Jackson coming

---

[9]Likewise, regarding the Petitioner's four-sentence argument supporting his assignment of error that "the evidence as a whole was insufficient to base his convictions for any of the crimes," based upon our review of the evidence used to support the Petitioner's second degree murder conviction under West Virginia Code §61-2-1 and his conviction for death of a child by a guardian under West Virginia Code § 6-8D-2a, as set forth more fully *supra* in the body of this decision, we find that there was sufficient evidence to support all three of the Petitioner's convictions. *See Guthrie,* 194 W. Va. at 663, 461 S.E.2d at 169, Syl Pts. 1 and 3.

forward about any conversation that he had with the Petitioner, Mr. Jackson had a tentative plea in place with the prosecuting attorney. *See supra* n.2. Months after the Petitioner's trial, Mr. Jackson ended up pleading guilty to a misdemeanor, rather than a felony, with no agreement as to sentencing other than he was to receive credit for time served.

The Petitioner contends that because the ultimate plea deal received by the witness was far more lenient than the plea agreement represented to the jury during trial the prosecutor's alleged misrepresentation of the plea agreement during the trial was such that "manifest injustice . . . resulted through [the] prosecutor's comments and that [the Petitioner] was prejudiced thereby." The Petitioner relies upon cases concerning improper remarks by prosecutors in closing arguments to support his position. *See* Syl. Pt. 5, *State v. Ocheltree*, 170 W. Va. 68, 289 S.E.2d 742 (1982)("A judgment of conviction will not be reversed because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice."); *see* Syl. Pt. 7, *State v. England*, 180 W. Va. 342, 376 S.E.2d 548 (1988)("A prosecutor may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw."); Syl. Pt. 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995)("A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice."); *see also id.* at 393, 456 S.E.2d at 474, Syl. Pt. 6 ("Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.").

The record is clear that the jury was aware of the tentative plea agreement between the State and Mr. Jackson at the time Mr. Jackson testified during trial. The jury was also aware that Mr. Jackson knew that his plea deal could change as a result of his cooperation with the State. Accordingly, we find that there was no improper conduct by the prosecuting attorney that either clearly prejudiced the Petitioner or resulted in manifest injustice.

C.     Ineffective Assistance of Counsel

The Petitioner next argues that his trial counsel failed to address the issue of mercy in any meaningful fashion during his closing argument. The Petitioner's appellate counsel argues that because his trial counsel failed to seek a bifurcated trial, it was "imperative that his counsel address the issue of mercy during his closing argument."

Ironically, the Petitioner's appellate counsel also asserts that "[w]hile trial counsel did an outstanding job of arguing with regard to the evidence in the case," his mention of mercy only once during closing constituted ineffective assistance of counsel.

We can not discern from the Appendix Record before the Court why the Petitioner's trial counsel handled the mercy issue in the manner in which he did. We, therefore, decline to address the Petitioner's argument concerning ineffective assistance of counsel. In *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995), we stated: "[W]e intelligently cannot determine the merits of this ineffective assistance claim without an adequate record giving trial counsel the courtesy of being able to explain his trial actions." *Id.* at 17, 459 S.E.2d at 128; *see State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 317 n.1, 465 S. E. 2d 416, 419 n.1 (1995) ("Traditionally, ineffective assistance of counsel claims are not cognizable on direct appeal. We have urged counsel repeatedly to think of the consequences of raising this issue on direct appeal. Claims that an attorney was ineffective involve inquiries into motivation behind an attorney's trial strategies.").

D.     Spectator's Outburst

The Petitioner argues that the circuit court erred in denying his motion for a mistrial following an outburst by a spectator during the Petitioner's testimony. When the Petitioner was testifying, a courtroom spectator said, out loud, "Liar." The spectator left the courtroom and the trial court instructed the bailiff that the spectator was not allowed back into the courtroom. The trial court then instructed the jury to "disregard the comments that were made by the spectator." The judge denied the Petitioner's subsequent motion for a mistrial based on the outburst.

The decision to declare a mistrial under the above-mentioned circumstances is within the sound discretion of the trial court. *See State v. Lowery*, 222 W. Va. 284, 288, 664 S.E.2d 169, 173 (2008) ("'The decision to declare a mistrial, discharge the jury and order a new trial in a criminal case is a matter within the sound discretion of the trial court. A trial court is empowered to exercise this discretion only when there is a "manifest necessity" for discharging the jury before it has rendered its verdict.;'")(quoting *State v. Williams*, 172 W. Va. 295, 304, 305 S.E.2d 251, 260 (1983)). We find that the trial court did not abuse its discretion in denying the Petitioner's motion for a mistrial.

E.     Cumulative Error

Lastly, the Petitioner argues that the cumulative effect of the errors set forth in his brief denied him a fair trial and, therefore, his sentence must be set aside and a new trial granted. *See* Syl. Pt. 5, *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972). As part of the cumulative error alleged, the Petitioner also asserts that the trial court erred: 1) in the

admitting evidence under West Virginia Rule of Evidence 404(b), which we dispensed with *supra* in note 6; 2) in failing to grant the Petitioner's motion to strike a juror for cause; 3) in failing to strike testimony about a marijuana pipe that was found during a search of the Petitioner's home; and 4) in admitting the work schedule for Stephanie, the victim's mother.

As to the juror issue, during jury selection, the trial court asked Juror Reeder if he thought he could be fair and impartial, despite the fact that the juror worked with children at church. The juror responded that it was terrible that children were involved, but he felt he could be fair and had no personal ill feelings toward the Petitioner. The juror said he would base his verdict solely on the evidence and not on his emotions. The trial court denied a motion to strike the juror for cause. The standard for reviewing a trial court's ruling on a motion on to strike a juror for cause is an abuse of discretion. *State v. White*, 228 W. Va. 530, 537, 722 S.E.2d 566, 573 (2011) ("'The determination of whether a prospective juror should be excused to avoid bias or prejudice in the jury panel is a matter within the sound discretion of the trial judge.' *O'Dell v. Miller*, 211 W. Va. 285, 288, 565 S.E.2d 407, 410 (2002)"); *see also State v. Miller*, 197 W. Va. 588, 605, 476 S.E.2d 535, 552 (1996) ("The trial court has broad discretion in determining whether to strike jurors for cause, and we will reverse only where actual prejudice is demonstrated." (citation and footnote omitted)). The circuit court did not abuse its discretion on this issue.

We turn next to the mention of a marijuana pipe. During cross-examination of the coroner, the Petitioner's counsel asked him if he saw any vodka bottles while he walked around the Petitioner's home. The witness responded that "I don't recall. I do recall a marijuana pipe in one of the bedrooms." This remark was brought about by the Petitioner's counsel's question with no objection, no motion to strike as unresponsive and no curative instruction requested. Later, after the Petitioner testified, a juror submitted a proposed question to the trial judge asking whether the Petitioner was on drugs the night Jada died. The Petitioner's trial counsel agreed with the trial court not to ask the proposed question. Because the Petitioner's counsel failed to object to the remark and failed to request a curative instruction, the Petitioner asserts that the trial court's failure to deal with the improper evidence and to give a curative instruction was "plain error." *See Miller*, 194 W. Va. at 7, 459 S.E.2d at 118, Syl. Pt. 7 ("To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings."). We decline to apply the plain error doctrine as there was no error regarding the witness' remark that was plain and that affected the Petitioner's substantial rights and seriously affected the fairness of the proceeding.

Likewise, we find no error concerning the admission of Stephanie's work schedule, referred to as Exhibit 60. The trial court expressly instructed the jury that the exhibit was not admitted for any truth of its contents, but to explain the course of the police

investigation.[10]

Therefore, given this Court's determination that no error exists regarding the Petitioner's convictions, the cumulative error doctrine is inapplicable to this case

### III. Conclusion

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED**: October 25, 2013

**CONCURRED IN BY**:

Chief Justice Brent D. Benjamin
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis Ketchum
Justice Allen H. Loughry II

---

[10]Stephanie originally told the police that she was not working the night of Jada's death. The police found her work schedule at her home, which showed that Stephanie was scheduled to work the night of Jada's death.